**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**


| | | |
|---|---|---|
| **ROBERTA IMMORMINO, ET AL.,** | ) | **CASE NO.1:13CV1818** |
| | ) | |
| **Plaintiffs,** | ) | **JUDGE CHRISTOPHER A. BOYKO** |
| | ) | |
| **Vs.** | ) | |
| | ) | |
| **LAKE HOSPITAL SYSTEM, INC.,** | ) | **OPINION AND ORDER** |
| | ) | |
| **Defendants.** | ) | |

**CHRISTOPHER A. BOYKO, J:**

This matter is before the Court on Defendant Lake Hospital, Inc.'s Motion for

Summary Judgment (ECF # 43).  For the following reasons, the Court grants Defendant's

Motion.

**Background Facts**

Plaintiffs Roberta Immormino's and Christine Pestello's Amended Complaint alleges

employment discrimination claims brought under the Age Discrimination in Employment Act

("ADEA") 29 U.S.C.  § 621-634 and Ohio Revised Code Sections 4112.14 and 4112.99 for

disparate treatment.   According to the Amended Complaint, Plaintiffs Roberta Immormino

and Christine Pestello were employed by Defendant Lake Hospital as nurses in the Obstetrics

Department ("OB").  Both Plaintiffs received good or excellent performance reviews during their employment.

While working third shift on the night of January 30-31, 2012,[1] Pestello and fellow nurse Megan King, Pestello's supervisor, were prepping a patient for an epidural.   King asked Pestello to prepare the operating room for another procedure involving a different patient. King stated she would take over the epidural.  King provided the physician the wrong medication which the physician injected into the patient.   Pestello finished prepping the other room and returned to check on the epidural patient.  She began charting in the patient chart of the epidural recipient.  King told Pestello to stop charting because King had made all the necessary notations in the chart.  Pestello complied and stopped charting in the epidural patient's chart.

When the epidural mistake was discovered, Nurse Managers Angie Quirk and Jennifer DiGeronimo began an investigation.  They determined that King handed the physician the wrong medication and further determined that Pestello had made charting errors.  According to the Amended Complaint, Pestello was falsely accused of charting events she did not personally witness.

Plaintiffs contend Defendant's policy allows nurses to correct charting errors within seventy-two hours of their entry or prior to the time the patient is discharged, whichever period is longer.  Furthermore, under the policy, even if Pestello had made the charting errors as alleged, Pestello should have received only a verbal reprimand or first written warning.

---

[1]

The Amended Complaint says January 31-Feb.1, 2012 but subsequent motion practice identifies the night in question as January 30-31, 2012.

Other nurses who committed similar alleged charting errors only received reprimands or written warnings.  Pestello was terminated due to her age and was replaced by a younger employee.  King who is also not in the protected class was retained.

On February 6-7, 2012, Plaintiff Immormino was working third shift as a charge nurse supervising other nurses in the OB.  There were several emergency situations that occurred that evening.  Quirk and/or DiGeronimo reviewed Immormino's charting and found "cut and paste" charting errors in the Soarian electronic charting system.   These errors were determined to be deliberate falsifications and resulted in Immormino's termination.  The errors were determined to be deliberate falsifications because Quirk was told by a patient that Immormino never performed her rounds that evening and into the next morning.  Plaintiffs allege this is not true because Quirk's earlier report contradicted this statement.  Immormino was terminated and replaced by a younger employee who was not a member of the protected class.

## **Defendant's Motion for Summary Judgment**

According to Defendant, both Plaintiffs received a number of corrective actions while employed.  These included charting errors, for which they received only warnings.   However, Defendant determined the charting errors made by Plaintiffs that resulted in their terminations were falsified entries.   Defendant contends charting is the one of the most important functions performed by nurses on a daily basis.  To facilitate this, Defendant employs the Soarian electronic records system.  Soarian is a medical records program that allows nurses to chart patients' vital signs and other date into a computerized medical chart chronicling a patient's care.  These charts are relied on by physicians and can result in changes to patient

care. Errors on charts expose hospitals to malpractice liability. Soarian contains a seventy-two hour window in which charting errors may be corrected but nurses are expected to chart within one hour of care. Under no circumstances may charting be done more than four hours after care. Given the seriousness of charting errors, Defendant's policies authorize immediate termination for falsifying medical records. The policies differentiate between falsifying records and inadvertent charting errors or omissions. According to DiGeronimo, "falsification" occurs when a nurse charts something that is not true or is factually incorrect. A charting "error" occurs when a nurse forgets to chart something, misspells something or writes down an incorrect date or time.

According to Defendant, on the night/early morning of February 6-7, 2012, Immormino was working a typical shift as charge nurse at Tri-Point Medical Center, a Lake Hospital facility, in the OB. Quirk was having an informal discussion with a patient who informed Quirk that Immormino had rarely been in the room all night and the patient received no assistance with the ultrasound system monitoring their child's heartbeat. A review of the Soarian system revealed Immormino had failed to take regular measurements of the patient's vital signs. Under Defendant's policies a nurse is expected to take a patient's pulse every thirty minutes, blood pressure every two hours and temperature every four hours. Immormino's chart entries for the entire night were made one hour after her shift had ended. Furthermore, and more problematic for Immormino, the vital sign entries appeared to be copied across each time slot showing that on each hour, the pulse, temperature and heart rate were all identical throughout Immormino's twelve hour shift. According to Defendant, Immormino admitted copying and pasting these entries in the patient's chart.

4

As if that were not serious enough, Defendant contends Immormino's copied and pasted vitals did not accurately reflect the true vital sign readings when compared to Defendant's Watchchild Fetal Monitoring System.  This computerized medical surveillance system records and archives a labor patient's and child's vital signs during labor and delivery.  When Quirk compared the Watchchild data with Immormino's charting entries she found discrepancies in the patient's vital signs readings.

Quirk then went back over Immormino's prior charting and found similar occurrences on six different occasions.  Quirk consulted with Defendant's Human Resources department and then terminated Immormino.

Defendant further contends Pestello's employment was terminated for false and misleading charting as well.   Defendant does not dispute that on the night of January 30-31, 2012, Pestello was assigned to care for an epidural patient but charge nurse Megan King instructed her to prep another room and not chart for the epidural patient since King would assume responsibility for the patient.

However, according to Defendant, after Pestello left the epidural patient around 7:10 p.m., Pestello continued charting at 7:30, 7:45 and 8:10 in the evening.  These entries do not match documentation and the timeline King entered for the procedure.  Pestello's entry gives the appearance that three IV fluid boluses were given to the patient when only one was actually given.  Pestello's charting indicates she gave the epidural patient a straight catheterization at 7:45 p.m. even though she was not in the room.  According to Defendant, upon questioning, Pestello admitted she did not provide the patient care but instead admitted it was King who administered it.  Pestello could not answer how these discrepancies occurred

5

but only recounted that she was trying to catch up on her charting.  After consulting with HR, Pestello was terminated by DiGeronimo.

## LAW AND ANALYSIS

### Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *See* Fed. R. Civ. P. 56(a).  The burden is on the moving party to conclusively show no genuine issue of material fact exists, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994); and the court must view the facts and all inferences in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Once the movant presents evidence to meet its burden, the nonmoving party may not rest on its pleadings, but must come forward with some significant probative evidence to support its claim.  *Celotex*, 477 U.S. at 324; *Lansing Dairy*, 39 F.3d at 1347.  This Court does not have the responsibility to search the record *sua sponte* for genuine issues of material fact.  *Betkerur v. Aultman Hosp. Ass'n.*, 78 F.3d 1079, 1087 (6th Cir. 1996); *Guarino v. Brookfield Township Trs.*, 980 F.2d 399, 404-06 (6th Cir. 1992).  The burden falls upon the nonmoving party to "designate specific facts or evidence in dispute," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986); and if the nonmoving party fails to make the necessary showing on an element upon which it has the burden of proof, the moving party is entitled to summary judgment.  *Celotex*, 477 U.S. at 323.  Whether summary judgment is appropriate depends upon "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must

prevail as a matter of law." *Amway Distribs. Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251-52).

Under 29 U.S.C. § 623(a)(1), it is unlawful for an employer to discharge any individual because of their age.  The Sixth Circuit has held that "claims of discrimination brought pursuant to Title VII, 42 U.S.C. § 2000e *et seq. ,* and the ADEA, 29 U.S.C. § 621 *et seq. ,* are analyzed under the same framework." *Policastro v. Northwest Airlines, Inc.* 297 F.3d 535, 538 (6th Cir. 2002).  In order to make a claim for age discrimination, an employee may offer either direct or circumstancial evidence of age discrimination.  *Lefevers v. GAF Fiberglass Corp.*, 667 F. 3d 721, 723 (6th Cir. 2012).  "Age discrimination claims brought under the Ohio Statute are analyzed under the same standards as federal claims brought under the ADEA." *Blizzard v. Marion Tech. College*, 698 F. 3d 275, 283 (6th Cir. 2012) (citing *Wharton v. Gorman-Rupp Co.*, 309 Fed. Appx. 990, 995 (6th Cir. 2009)) (internal quotation marks omitted).  "The burden of persuasion is on the plaintiff to show that age was a 'but-for' cause of the employer's adverse action." *Blizzard*, 698 F. 3d at 283 (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009)).

Unlawful discrimination under the ADEA may be shown by direct or indirect evidence.  "Direct evidence of discrimination is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Wexler v. White's Fine Furniture, Inc.*, 317 F. 3d 564, 570 (6th Cir. 2003).  "Direct evidence of age discrimination alone is not enough to avoid summary judgment in an ADEA action," and there must be proof of a causal connection between the alleged remarks and the adverse employment action.  *Antonucci v. Goodyear Tire & Rubber Co.*, No. 93-3135, 1994

7

WL 49569 (6th Cir. Feb. 17, 1994) (citing *Monaco v. Fuddruckers, Inc.*, 1 F. 3d 658 (7th Cir. 1993)).  Here, the parties concede there is no direct evidence of age discrimination under the ADEA and instead argue summary judgment on the basis of indirect or circumstantial evidence.

When an age discrimination claim is premised on indirect or circumstantial evidence, the three-step framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) guides the analysis.  *Provenzano v. LCI Holdings, Inc.*, 663 F. 3d 806, 811-812 (6th Cir. 2011); *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F. 3d 344, 350 (6th Cir. 1998).  An employee has the initial burden of establishing a prima facie case.  *McDonnell Douglas Corp.*, 411 U.S. at 802.  If met, the burden shifts to the employer to proffer a legitimate, non-discriminatory reason for the adverse employment action.  *Id.*  Then, if such a reason is given, the burden shifts back to the employee to show this reason is pretext for discrimination.  *Id.*

**Prima Facie**

In order to establish a prima facie case of age discrimination under the ADEA, a plaintiff must demonstrate by a preponderance of evidence that: 1) she is a member of a protected class; 2) she suffered an adverse employment action; 3) she was qualified for the position; and 4) that circumstances support an inference of discrimination.  *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002).  "An allegation that the plaintiff was replaced by a younger individual supports an inference of discrimination only if the difference in age is significant." *Blizzard,* 698 F.3d at 283  *citing Grosjean v. First Energy Corp.,* 349 F.3d 332, 336 (6th Cir. 2003) (which stated that an inference of discriminatory intent cannot be "drawn from the replacement of one worker with another worker insignificantly younger.").  The

8

burden at the prima facie stage is not an onerous one, and it is easily met.  *Cline v. Catholic Diocese of Toledo*, 206 F. 3d 651, 660 (6th Cir. 2000).  The prima facie phase "merely serves to raise a rebuttable presumption of discrimination by eliminating the most common nondiscriminatory reasons" for an employee's termination.  *Id.*

There is no dispute that Plaintiffs were both members of a protected class as they were over forty years of age.  *See* 29 U.S.C. §631(a).  It is undisputed that Plaintiffs suffered an adverse employment action as both were terminated in February 2012.  Also, Defendant does not contest that Plaintiffs were qualified for their jobs.

To satisfy the fourth step of the prima facie stage, a plaintiff must show circumstances that support an inference of age discrimination.  *Blizzard,* 698 F. 3d at 283.  An allegation that the plaintiff was replaced by a younger individual supports an inference of discrimination only if the difference in age is significant.  *Grosjean,* 349 F. 3d at 336.  In "disparate treatment cases, the fourth element may be replaced with the requirement that the plaintiff show she was treated differently from similarly-situated individuals." *Policastro ,* 297 F.3d at 539.

Defendant concedes Plaintiffs were replaced by younger workers outside the protected class.  "In this case, Defendant does not dispute that the individuals who eventually assumed Plaintiffs' job duties were younger than forty years of age."  (ECF # 30-1, pg. 6).  With all four elements, Plaintiffs have met their "slight" burden at the prima facie stage demonstrating age discrimination.

**Defendant's legitimate, nondiscriminatory reason for Plaintiffs' termination**

Once the plaintiff has made a prima facie case of age discrimination, the burden of

production shifts to the employer to proffer a legitimate, non-discriminatory reason for their adverse employment action.  *Provenzano,* 663 F. 3d at 812.   Defendant  need not "persuade the court that it was actually motivated by the proffered reasons," but rather simply "raise a genuine issue of fact."  *Id.* at 814-815.  "It is sufficient if the defendant's evidence raises a genuine issue of fact" by introducing admissible evidence for a legitimate, non-discriminatory reason. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254-255 (1981). Defendant contends both Plaintiffs falsified patient charts, which is grounds for immediate termination under Defendant's policies.  Such falsification exposes Defendant to potential liability as it could result in improper treatment of patients and/or risk patient safety. Defendant cites the testimony of Angelie Quirk, R.N., Director of Women's and Children's Services at Lake Hospital System, Inc and supervisor of the OB unit at Tri-Point to support its proffered non-discriminatory reason.   Quirk supervised Immormino in the OB.  According to her affidavit (ECF # 44-1 pg. 2), Quirk attests that under Defendant's Performance Corrective Action Policy ("PCA Policy") falsification of medical data, or other official records may result in immediate termination.  Quirk's affidavit further attests that, based upon a patient complaint of inattention by Immormino, Quirk examined Immormino's charting and found several irregularities.  First, her chart entries for the night were all made one hour after her shift ended the following morning.  This violated Defendant's charting policy. (Quirk aff. pg. 5).  Per hospital policy, a patient's blood pressure was supposed to be checked every two hours, however, the patient in question was admitted for pregnancy induced hypertension and therefore, should have had her blood pressure checked every hour.  Instead, Immormino's charting showed a blood pressure was taken at 7:47 p.m. and again at 6:49 a.m.  (Id.)  No

10

other readings were taken in the intervening ten hours. (Id.). No temperature readings were taken during Immormino's twelve hour shift. (Id.). Again, Defendant's policy called for temperature readings to be taken every four hours.

Furthermore, Immormino's chart for the night showed the exact same readings for the entire twelve hour shift on the patient's reflexes and pulse. (Id.). These did not match the readings off the Watchchild Monitoring System, which recorded fluctuating pulse rates throughout Immormino's shift. (Id. at 6). Along with several other discrepencies, this suffices to meet Defendant's burden of production for the second step of the *McDonnell Douglas* analysis concerning Immormino.

Regarding Pestello, Defendant offers the affidavit and deposition testimony of Jennifer DiGeronimo, R.N., manager of the OB unit at West Medical Center, a Lake Hospital facility, where she supervised Pestello. Like Quirk, DiGeronimo attests that, under Defendant's PCA Policy, falsification of medical data, or other official records, may result in immediate termination. DiGeronimo attests that on the night of January 30, 2012, Pestello made the following errors on her charting:

> a. Ms. Pestello documented three (3) IV fluid boluses for the epidural patient, all occurring at different times. The way this is entered leaves the reviewer to believe that the patient received three (3) separate fluid boluses. The patient however received only one (1) IV fluid bolus.

> b. Ms. Pestello's charting entries state that she performed a straight catheterization of the patient at 1945. Ms. Pestello was not present in the room at this time. Relying on Megan King's documentation, supported by the Watchchild Federal Monitoring tracing (a computer surveillance system that archives a labor patient's vital signs and other information), I concluded that this was an erroneous and false charting entry. When I questioned Ms.Pestello as to why this false documentation was entered, she stated, "I don't know how that got there."

c. Ms. Pestello states at 1945 that she notified Dr. Salovan for an anesthesia consult/epidural placement. The way this was entered leaves the reviewer to believe that Dr. Salovan was contacted a second time for a second epidural placement when in fact, he was contacted only once and the patient required only one epidural. When I asked Ms. Pestello if she at any time contacted Dr. Salovan or anesthesia for an epidural placement for this patient, she stated, "no." When questioned why she would enter an event that she did not perform, Ms. Pestello told me she was "trying to catch up on my charting."

d. Ms. Pestello enters at 2010 that she is in seeing the patient and answering questions with respect to the epidural procedure at that time. According to the correct timelines and Megan King's documentation, Ms. Pestello was not in the room at this time to perform that action.

(ECF # 44-2 pg. 5-6).

DiGeronimo, in Pestello's February 10, 2012 PCA, terminating her employment, wrote "Christine document (sic) with times; specific procedures & events which did not occur or which she did not witness." (ECF # 44-4). In light of the above testimony, Defendant has met its burden articulating a legitimate, non-discriminatory reason for terminating both Plaintiffs.

**Pretext**

With a legitimate, non-discriminatory reason given by Defendant, the burden shifts back to Plaintiffs to show that it is merely pretext for age discrimination. *Bender v. Hecht's Dept. Stores*, 455 F. 3d 612, 624 (6th Cir. 2006). At this stage, "the burden of producing evidence of pretext essentially merges with the burden of persuasion, which always lies with the plaintiff." *Gragg v. Somerset Technical Coll.*, 373 F. 3d 763, 768 (6th Cir. 2004) (quoting *Wilkins v. Eaton Corp.*, 790 F. 3d 515, 522 (6th Cir. 1986)). Plaintiffs may demonstrate pretext by showing that defendant's proffered reason "(1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the

12

challenged conduct." *Wexler*, 317 F. 3d at 576 (quoting *Dews v. A.B. Dick Co.*, 231 F. 3d 1016, 1021 (6th Cir. 2000)).

**Pretext and Immormino**

Plaintiffs argue that Defendant lacked an honest belief that Plaintiffs falsified charts because Defendant made its own errors in following its own policies.  Under the "honest-belief" rule "[w]hen an employer reasonably and honestly relies on particularized facts in making an employment decision, it is entitled to summary judgment on pretext even if its conclusion is later shown to be mistaken, foolish, trivial, or baseless." *Chen v. Dow Chem. Co.,* 580 F.3d 394, 401 (6th Cir. 2009) (internal quotation marks omitted). "An employer's pre-termination investigation need not be perfect in order to pass muster under the rule." *Loyd v. Saint Joseph Mercy Oakland,* 766 F.3d 580, 591 (6th Cir. 2014) (citing *Seeger v. Cincinnati Bell Tel. Co.,* 681 F.3d 274, 285 (6th Cir. 2012)). "The key inquiry is instead 'whether the employer made a reasonably informed and considered decision before taking an adverse employment action.'" *Id.* (quoting *Seeger,* 681 F.3d at 285).  "And to rebut an employer's invocation of the rule, the plaintiff must offer some evidence of 'an error on the part of the employer that is too obvious to be unintentional.'"  *Id.* (quoting *Seeger,* 681 F.3d at 286).

Immormino contends that the night shift of February 6, 2012 was "particularly busy." Defendant had only recently transitioned its charting to a new electronic charting system called Soarian, introducing it to the OB unit in the fall of 2011.  Immormino's  first Soarian admission was December 24, 2011.  Immormino used the "cut and paste" feature of the Soarian system to populate the required data fields used in charting vitals.  According to

13

Immormino, on the night of February 6, 2012, an error occurred whereby the same vital sign readings were reproduced multiple times over multiple fields.  Immormino does not offer an affidavit or declaration attesting to a cut and paste error.  Instead, the only evidence she cites in support of this explanation is the deposition testimony of Samantha Phillips R.N.  Phillips was the RN/OB educator at Lake Hospital.  Her job duties included training and orienting new RN personnel and ensuring competency of the existing staff.  (Phillips depo pg. 5-6).  She also provided ongoing education for existing staff on new policies and procedures.  (Id.).  Furthermore, she was the facilitator for the new Soarian system.  (Id at pg. 8).  Phillips was unaware of any system issues with Soarian.  Phillips further testified that facilitators were present on the floor to help with any problems staff may have had in using the system.  (Id at pgs. 11-12).  Phillips was also unaware of any charting errors due to a lack of knowledge on using the Soarian system.  (Id. at 12-13).  When Phillips transitioned from facilitator to educator in January of 2012, she began auditing charts for multiple reasons, including quality control, follow up on patient complaints and  pharmacy errors (Id. at 14).  When asked about the number of duplicate entries made by Immormino on the night in question, Phillips believed such entries were the result of cut and paste errors.

> A.    Correct.  And it wasn't matching with -- Like  I said, the blood pressure
>          would be the exact same for 12  hours and that would be --
>
> Q.    Okay.  So wasn't it obviously a mistake?
>
> A.    To me it looked like it was obviously just a copy-and-paste situation.
>
> Q.    Okay.  You don't think Miss Immormino was trying to deceive anybody
>          into believing that she had actually been in the room every 15 minutes

14

to check the patient's blood pressure, do you?

    A.   No.

(Id. at 27).

Immormino further argues that other nurses outside the protected class made similar charting errors but were not terminated. Immormino points to Alicia Foltz R.N., another OB nurse. During her tenure at Lake Hospital, Foltz, on deposition, testified to having received verbal warnings for charting errors and errors in patient care. These charting errors included: failure to record a patient's vital signs throughout a shift; failing to complete documentation concerning a code pink during a Caesarean delivery; no proper assessments of a patient in a fourteen hour period, and failure to properly chart care of a newborn. Yet, Foltz was not terminated while Immormino was.

Lastly, Immormino contends the ultimate decision-maker, Craig Ghidotti, Vice-President of Human Relations, could not determine whether Immormino's charting errors were mere human error or falsification.

Defendant points to a number of flaws in Plaintiff's Opposition that severely hamstring Plaintiff's case. Plaintiffs have offered no evidence of disparate treatment by Defendant, favoring employees outside the protected class or substantially younger than Plaintiffs. Plaintiffs' First Amended Complaint alleges three claims for discrimination, all based on disparate treatment. Count I is captioned ADEA Violation-Disparate Treatment and at paragraph 29 it reads: "Defendants failed to follow the corrective action guidelines, and/or ordinary practices in order to terminate older Obstetrics nurses in the class protected by the ADEA and replace them with younger nurses." Plaintiffs sole comparator is Alicia Foltz,

15

R.N. Plaintiffs state she is outside the protected class. However, it is Plaintiffs' burden to demonstrate by competent evidence that she is outside the protected class and they have not. See *Noble v. Brinker Intern., Inc.* 391 F.3d 715, 731 (6th Cir. 2004). ("It is the plaintiff's burden to establish that a similarly situated person outside the protected class was treated more favorably than he. *(Internal citation omitted).* Noble had the benefit of full discovery, but at trial he was unable to produce a single person who fit this description. Generalized allegations unsupported by evidence are insufficient to meet the plaintiff's burden.").

Plaintiffs offer no evidence of Foultz's age. In Foultz's deposition excerpt she was never asked how old she is. Simply put, there is no evidence cited by Plaintiffs evidencing Foultz is younger than Plaintiffs. By failing to produce such evidence or cite the Court to such evidence, Plaintiffs have failed to produce any evidence of disparate treatment by Defendant favoring younger employees over employees in the protected class.

Even if Plaintiffs could show Foultz was outside the protected class or substantially younger than Plaintiffs, her charting errors did not involve charting wrong vital sign readings like Immormino. Instead, Foultz failed to record vital signs on the patient chart but instead only included them in her report sheet. (Foultz depo. Pg 13). She was allowed to correct the omissions later. In a second incident, she failed to fill out paperwork for a code pink which involves assisting with a delivery. (Id. at 16-17). A third incident again involved failing to record vitals in a patient chart. (Id. at 17). Lastly, Foultz failed to document an assessment of a newborn. (Id. at 18). All these errors by Foultz involved omissions of charting entries which Defendant determined were not falsifications.

Quirk, who made the decision to terminate Immormino, (Quirk Aff. pg. 8)

16

distinguished between charting errors and falsifications.  Quirk's affidavit states at paragraph 7:

> Pursuant to Lake Health's Performance Corrective Action Policy ("PCA Policy"), attached to my affidavit as Exhibit "A," some offenses, such as falsifying an employment application, personnel records, medical data, or other official records might result in immediate discharge without benefit of a verbal or written warning. Based on the PCA Policy, I view falsification of records as an offense warranting immediate termination, whereas lesser offenses, such as failing to complete a patient chart or omitting certain information deserve written or verbal corrective action.

Quirk's affidavit discusses a number of PCA's taken against Immormino in the course of her employment.  These included a PCA for failure to document a patient's reflexes hourly.  Quirk determined this to be an error of omission and issued the PCA.  However, when looking at Immormino's charting on the night of February 6-7, 2012, Quirk determined, based on a thorough review of Immormino's charting, that her entries were false entries, not mistaken entries and were fabricated readings entered one hour after Immormino's shift had ended.  Based on her review, Quirk determined Immormino did not perform a true assessment of her patient and, given the discrepancies between Immormino's cut and pasted entries and the Watchchild readings, Quirk determined Immormino's entries were demonstrably false, resulting in risk to patient safety.

Immormino admits on deposition that she knew how to use the cut and paste feature of the Soarian charting system (Immormino depo pg. 72-72); and that patient vitals change minute by minute (Id at 73-74).  She further acknowledged that it was important to chart at regular intervals.  (Id at 77-78).  She also admits that her failure to do so on the night in question put her patient at risk. (Id at 78).  She admits some data entered is inaccurate but contends the IT department was having trouble with the Soarian system populating vital signs

to the next column. (Id at 87-88).  However, she admits to using the copy and paste feature to enter patient vitals on the evening in question.  (Id. at 92).  While Immormino contends that certain vital sign fields were duplicating due to system issues, she acknowledges that the system was not duplicating other patient information such as mother's activity, pain rating and mother's position (Id. at 89-90).  Yet these were all the same entries as well.  According to Immormino, these were what the patient must have told her and she recorded them on notes she kept but subsequently threw the notes away that evening.  (Id. at 91).

When Quirk discovered Immormino's cut and paste entries on the night of February 6, 2012, Quirk went back and examined Immormino's charting from several months earlier and found six similar cut and paste entries by Immormino.  Quirk is unaware of similar errors by other nurses.  (Quirk aff. at 8).  Immormino relates that when she was first told of the six additional errors she asked if the review went back and looked at her charts prior to the Soarian system.  Immormino states that Quirk acknowledged she did not look at the older handwritten charts.

In his investigation of Immormino's grievance, Craig H. Ghidotti, Vice-President of Human Resources, determined that no other nurses experienced the charting problem Immmormino allegedly experienced on February 6, 2012.  Furthermore, a problem with the system on February 10, 2012, was limited to data repeating in two fields only and only on that date.  This was supported by the deposition testimony of nurses Megan King, Samantha Phillips and Kathy Holden, all of whom stated they were unaware of any system glitches in the Soarian system. (King depo. Pg. 10) (Phillips depo pg. 9)(Holden depo. Pg. 13).  Holden did state that Immormino's entries could have been caused by the cut and paste feature of

18

Soarian.  (Holden depo. Pg. 20).

Having reviewed the above facts, the Court finds Immormino has failed to demonstrate Defendant's termination of her employment arose from an intent to discriminate against her based on her age.   Immormino admits making charting errors that inaccurately captured a patient's vital signs.  She admits this compromised patient care.   The Sixth Circuit has admonished courts not to second guess employer personnel decisions for their correctness or fairness.  "Time and again we have emphasized that [o]ur role is to prevent unlawful hiring practices, not to act as a super personnel department that second guesses employers' business judgments."  *Corell v. CSX Transp., Inc.,* 378 F. App'x 496, 505 (6th Cir.2010) (quoting *Risch v. Royal Oak Police Dept.,* 581 F.3d 383, 399 (6th Cir.2009).  Instead, the Court's role is to determine whether there exists genuine issues of fact sufficient so that a reasonable jury could find Plaintiffs' termination was the result of unlawful discrimination based on age.  The Court finds no such genuine issues of fact concerning Immormino's termination exist.

First, there is no evidence that Quirk made any statements to Plaintiffs or any other employee evidencing a bias against people in the protected class.  Nor has she shown any inconsistent statements by Defendant as to the reason for her termination.[2]  There is, therefore, no evidence offered by Plaintiffs evidencing a discriminatory animus.

Second, there is also no evidence that Defendant treated employees outside the

---

[2]       Immormino does argue that Ghidotti made no finding of falsification in his upholding her termination, but it is undisputed that Quirk made the decision to terminate and that Ghidotti reviewed the decision after termination and after Immormino filed a grievance.  Thus, the record demonstrates that Quirk was the decision maker in deciding to terminate Immormino's employment based on falsifying a patient's chart.

protected class differently than Immormino.  Plaintiffs have failed to offer any evidence that their sole comparator, Alicia Foultz is outside the protected class or significantly younger than Plaintiffs.  In fact, there is no evidence of her age at all.

Third, even if Foultz were outside the protected class or younger than Immormino, Immormino  fails to show she was treated differently than others outside the class because she fails to show her charting errors were similar to those charting errors made by Foultz.  Foultz's errors were errors of charting omissions; failing to chart readings.  Immormino admitted charting false entries-i.e. entries that did not accurately reflect the patient's true vital signs.  This distinction undisputedly caused a safety risk to the patient and potential liability for Defendant.

Thus, even construing all facts in favor of Immormino, no reasonable jury could find that Defendant's termination of Immormino had no basis in fact.  Instead, the facts clearly show Immormino intentionally failed to accurately chart her patient's vitals, and entered vital readings that were inconsistent with the Watchchild readings.  By her own admission, a patient's vitals change minute by minute and inaccurate vital readings present a risk to the patient's health.  Immormino's charting entries show unchanging vital readings across a twelve hour period. Furthermore, Immormino has not presented evidence that other nurses made similar inaccurate charting entries.  Based on the above facts, Immormino has failed to show her charting inaccuracies did not actually motivate Defendant's decision to terminate her.  Defendant found no other nurses experienced such duplication of vital signs.  Thus, Defendant had a sufficient, honest belief that Immormino's charting was false.

Plaintiff has offered no evidence of discriminatory animus outside of Defendant's

20

replacing her with a younger nurse.  Furthermore, Immormino had previously failed to chart a patient's reflexes and received only a warning therefore, the evidence demonstrates that when she made charting omissions she received the same punishment as her comparator.

Finally, Defendant has shown that its relevant policies made it a terminable offense to falsify patient records.  Therefore, Immormino has failed to show pretext as the conduct at issue was sufficient to warrant immediate termination.

Therefore, for the foregoing reasons, the Court grants Defendant Summary Judgment on all of Immormino's claims.

## Pretext and Pestello

Pestello also presents no statements by her supervisors evidencing a discriminatory animus, nor can she show she was treated differently then someone outside the protected class or someone substantially younger than herself.  Instead, Pestello argues she was replaced by a younger nurse and her charting errors were simply errors and not falsifications.  Under Defendant's policies, she argues such errors were not sufficient to warrant the extreme sanction of termination.  Furthermore, she contends several of the stated charting errors were not errors at all but instead were misrepresentations by DiGeronimo.  In fact, Pestello argues, her patient received all the care documented in her charting; she simply entered the wrong times for the care received.

In her deposition, DiGeronimo acknowledged that the patient did receive a fluid bolus, an epidural and was visited by the physician. (DiGeronimo depo pg. 19-20).  All these patient interventions were documented by Pestello.  According to DiGeronimo, the falsification occurred when Pestello charted patient care as if she, Pestello, were in the room when, in fact,

it was Megan King who was in the room and providing the patient care. (Id. at 20-21).  Also, DiGeronimo testified that the times of the care did not match up.  For instance, Pestello charted a bladder catheter was used to empty a patient bladder at 7:45 p.m.  However, this could not have occurred at this time, according to DiGeronimo, because that was when the epidural was being administered.  Therefore, the timing on the charts was inaccurate.  As it turns out, Nurse King was charting the same patient at the same time that Pestello was charting.   Undeniably, King was present during the epidural procedure and Pestello was not.  DiGeronimo, as did Quirk, when investigating the discrepancies between Pestello's charting and King's, consulted the Watchchild monitoring system and found its readings supported King's charting timeline while showing that Pestello's was inaccurate.

According to DiGeronimo, when a nurse enters a charting entry, she is acknowledging she performed the care being charted.  Because the chart is a legal document, such representations are important.  The charting system does allow a nurse to chart care provided by another nurse, but according to DiGeronimo, the nurse charting such care would have to acknowledge that another actually performed the care provided.  (Id. at 34-36).  To do otherwise is inappropriate according to DiGeronimo. (Id at 36).  Pestello's charting entries do not credit the care to King.

Pestello admits to errors in timekeeping but not patient care.  Pestello contends she performed all the patient care she charted, however, she forgot the correct times she provided the care and inaccurately recorded the times in her charting.

In order to prove pretext, a plaintiff must set forth more than a dispute over the facts upon which her discharge was based. *Braithwaite v. Timken Co.,* 258 F.3d 488, 493–94 (6th

Cir.2001). Instead, the plaintiff must "put forth evidence which demonstrates that the employer did not "honestly believe" in the proffered non-discriminatory reason for its adverse employment action." *Id.* at 494. "In order to determine whether the employer had an 'honest belief,' it is necessary to consider whether the employer can establish its 'reasonable reliance' on the particularized facts that were before it at the time the decision was made." *Hodges v. City of Milford*, 918 F.Supp.2d 721, 739 -740 (S.D. Ohio 2013), citing *Braithwaite,* 258 F.3d at 494. In *Smith v. Chrysler,* 155 F.3d 799, 807 (6th Cir.1998), the Sixth Circuit provided the following guidance for courts considering whether an employer's proffered non-discriminatory reason for an adverse employment action was based on an honest belief. When "deciding whether an employer reasonably relied on the particularized facts then before it, we do not require that the decisional process used by the employer be optimal or that it left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." Courts may not second guess the business judgment of an employer but must instead determine "whether the employer gave an honest explanation of its behavior." *Hedrick v. W. Res. Care Sys.,* 355 F.3d 444, 462 (6th Cir.2004). The United States Supreme Court has determined that "[a] plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves v. Sanderson Plumbing Products,* 530 U.S. 133, 148 (2000). In *Smith v. Chrysler,* 155 F.3d 799, 806–07 (6th Cir.1998), the Sixth Circuit quoted favorably from a decision out of the D.C. Circuit Court, *Fischbach v. District of Columbia Dept. of Corrections,* 86 F.3d 1180, 1183 (D.C. Cir.1996), wherein the court held, "[I]f the

23

employer made an error too obvious to be unintentional, perhaps it had an unlawful motive

for doing so."

In construing all evidence in favor of the non-movant, the Court finds Plaintiff

Pestello has failed to demonstrate a genuine issue of fact that Defendant's stated reason for

her termination was pretextual.  All sides agree that Defendant's scrutiny of Pestello's

charting on the night in question was unrelated to anything Pestello did, but was instead

initiated due to a concern that the wrong epidural medication had been given to patients.  In

her deposition at pg. 69, Pestello was asked:

> Q. Okay. Was the question one -- if you don't  know, that's fine, but was the
> question one that you believe this was an issue of maybe a clinical mistake
> they were questioning somebody else about, like a potential malpractice issue
> that we're talking about and they wanted to figure out who had cared for this
> person at a certain time, or was it just questioning because there were
> discrepancies in the chart?
>
> A. No. This discrepancy of mine was not discovered until they were looking
> through the chart for another specific reason. There was an epidural error –
> medication error, and that's why they were looking through the chart and that's
> when they found my error.
>
> Q. Was there another error, an error prior to your error that was found before
> they found yours?
>
> A. Yes.
>
> Q. What error was that?
>
> A. The wrong medication was given in an epidural to three or four different patients
> that night...

Pestello's understanding of the reason for the initial investigation is supported by the

affidavit of Jennifer DiGeronimo at pg 4 para.16 "Subsequently, I reviewed the electronic

medical charts for this epidural patient in connection with an investigation regarding a

24

possible medication error.  Upon reviewing the charts, I saw that Nurse King had documented completely all of the steps taken with the patient while she was under Nurse King's care.  I also saw that Ms. Pestello had documented, with times, specific procedures and events which did not accurately reflect the patient's care as chronicled by Charge Nurse Megan King."  Thus, Defendant reviewed the charts of that evening in connection with a medication concern that did not involve Pestello.  However, it was in the course of that investigation that DiGeronimo discovered the inconsistent charting of Pestello versus King.  It was then that DiGeronimo noticed that Pestello's charting could not be accurate given the chart entries of King.  DiGeronimo then reviewed the Watchchild records and compared them to King's and Pestello's and found it supported King's charting chronology as opposed to Pestello's.  Upon questioning Pestello, Pestello admitted to chart errors in recording the times care was given.  The parties dispute whether Pestello acknowledged that the entries were false entries.

In Pestello's termination PCA of February 10, 2012, DiGeronimo writes that the reason for Pestello's termination is "Christine document (sic) with times; specific procedures & events which did not occur or which she did not witness."  The uncontested evidence demonstrates, as Plaintiff herself admits, that her charting for the night of January 30, 2012, contains several errors.  These errors reflect care for a patient that could not have been given at the times Pestello charted the care was given because Pestello was not in the room.  Pestello states that she was told by Megan King to prep the OR for an expected Caesarean procedure.  Pestello left her patient in King's care at approximately 7:10 p.m.  Pestello charted at 7:10 p.m. "Fluid bolus for epidural.  Procedure explained to pt. questions answered."  King's first chart entry is 7:30 p.m.  Pestello charts again at 7:30 p.m. "FHR

variable down to 70's. Pt turned to right side and O2 applied 8-10L/min.  Dr. Clinger in room."  There is no dispute Pestello was not in the room and could not have observed the events or provided the care she charted at the time she charted.  At 7:30 p.m. King charted, "turned pt. to far left lateral.  O2 continues.  Dr. Clinger at bedside.  Fluid bolus LR continues.  Anesthesia notified of epidural consult needed."  Pestello charts again at 7:31 p.m. "FHR stable now @ 115w/good variability."  Again, it is not disputed Pestello was not in the room at this time.  At 7:40 p.m. King charts "Dr. Salovan at bedside obtaining consent.  Pt and mother agree to epidural procedure and deny questions.  Both pt and mother signed consent. Pt. Sitting up for placement and off monitors.  See anesthesia record for vs." Then, at 7:45 p.m. Pestello charts "Bladder emptied via catheter 500ml.  Clear yellow urine.  Dr. Salovan notified for epidural placement."  Again, there is no dispute Pestello did not perform this patient care at 7:45 p.m. because she was still prepping the OR.  DiGeronimo further stated on deposition that a patient's bladder would not be emptied during an epidural placement, "And then also things don't match up, so I can't say whether that was done or not. But at 1945 a bladder being emptied with a catheter really could not be happening during an epidural procedure placement."  (DiGeronimo depo. Pg.21).   Furthermore, DiGeronimo asserts in her affidavit at page 6:

> c. Ms. Pestello states at 1945 that she notified Dr. Salovan for an anesthesia consult/epidural placement. The way this was entered leave the reviewer to believe that Dr. Salovan was contacted a second time for a second epidural placement when in fact, he was contacted only once and the patient required only one epidural. When I asked Ms. Pestello if she at any time contacted Dr. Salovan or anesthesia for an epidural placement for this patient, she stated, "no." When questioned why she would enter an event that she did not perform, Ms. Pestello told me she was "trying to catch up on my charting."

Pestello counters in general that she provided all the care she charted but nowhere does she assert she called Dr. Salovan.  In fact, in her deposition, she testifies specifically to starting the bolus and administering the catheter.  She never testifies that she contacted anesthesia for a consult.

At 7:55 p.m. King charts "epidural placed by anesthesia.  Pt tolerated well. Test dose given by anesthesia.  LR/l hung at 125ml as ordered."  At 8:10 p.m. Pestello charts "Seen pt. Denies needs.  States pain @ 4/10.  IVF increased to bolus for epidural placement.  Procedure explained to pt. questions answered."  This entry could not be accurate because the epidural had already been placed at 7:55 p.m. according to King's charting.  DiGeronimo attests that King's timeline was verified by cross-referencing with the Watchchild monitoring system.  Furthermore, Pestello's 8:10 p.m. entry repeats her entry of 7:10 p.m. that the procedure was explained to the patient and her questions were answered.   Given that the procedure had already occurred there would be no need to explain the procedure after it was performed, especially since it had already been explained to the patient at 7:10 p.m.  by Pestello.

Under Defendant's Policy and Procedures discharge may be implemented for  "Failure to report correct information for employment application, personnel records, medical data, or other official records.  Refrain from omission of pertinent facts or giving false information."  In light of the above undisputed facts, a jury could not find Defendant did not honestly believe Pestello failed to report correct information for medical data or gave false information.  Her charts admittedly contain false information that care was provided when Pestello was not present in the room.   Pestello argues that some of the bases cited by DiGeronimo are not true. For instance, Di Geronimo contends the charting gives the

27

impression three boluses were administered while in fact only one was administered.  Pestello contends a plain reading of the chart shows one bolus that was continuously used. All other charting errors she credits to inaccurate time charting while asserting the care was actually provided.

Crediting Pestello, as the Court must, that all the care described was actually provided still does not create an issue of fact that Defendant's honestly believed Pestello entered false information in a patient's chart.   Defendant, while investigating a medication error noticed several discrepencies in the patient's chart.  When questioned about the discrepencies, Pestello admitted charting for care she could not have provided when she charted she had provided it.   In her investigation, DiGeronimo cross-referenced the charting entries with the Watchchild electronic record and found those records supported King's timeline while supporting a finding that Pestello's were erroneous.  King charted that she notified anesthesia of the need for a consult at 7:30 p.m.  Yet, after Dr. Salovan, the anesthesiologist, had already visited the patient, Pestello charts at 7:45 p.m. that she contacted Dr. Salovan for the epidural. According to DiGeronimo, Pestello was asked if she contacted Dr. Salovan and Pestello said "no."  Pestello never denies this.  Thus, Defendant had an honest belief that false entries were made in a patient chart based on particularized facts and its decision to terminate Pestello, albeit harsh, was undeniably based on a reasonably informed and considered review.  This decision is also supported by the fact that just one month earlier, Pestello was given a PCA for charting errors concerning the entry of the wrong date of birth for a patient and other documentation errors, which were determined to be mere errors and she only received a written warning.  (See Ex. 44-4).  Again, Pestello has shown no similarly situated comparator,

outside the protected class, was treated more favorably, nor has she shown another employee who engaged in the same charting errors was treated less harshly.

Therefore, for the foregoing reasons, the Court grants Defendant's Motion for Summary Judgment on Plaintiffs' Immormino and Pestello's claims under the ADEA.  Since Plaintiff's state law age discrimination claims are analyzed similarly, summary judgment is also appropriate on their state law claims as well.

IT IS SO ORDERED.

s/ Christopher A. Boyko
CHRISTOPHER A. BOYKO
United States District Judge

Dated:  August 31, 2015